USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/2/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

JIMMIE GILMORE,

               Defendant.

19 Cr. 724 (JGK)

OPINION AND ORDER

---

JOHN G. KOELTL, District Judge:

    The defendant, Jimmie Gilmore, has been indicted on two counts of Hobbs Act robbery in violation of 18 U.S.C. §§ 1951 and 2, and two counts of using, carrying, and possessing a firearm during and in relation to a crime of violence, namely the two violations of the Hobbs Act, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii) and 2. The defendant has now moved to suppress a pair of shoes seized from Apartment 1B at 625 Jefferson Place, in the Bronx. The shoes were seized after the leaseholder for the apartment gave oral and written consent to the search of a room described as "Jimmie Gilmore's bedroom." The Government contends that the leaseholder had actual and apparent authority to consent to the search and that the shoes were discovered in plain view in the bedroom. The Court held an evidentiary hearing on August 10, 2020, and now makes the following findings of fact and reaches the following conclusions of law. For the reasons explained below, the motion to suppress is **denied**.

1

**Findings of Fact**

On September 10, 2019, after the defendant had been arrested, more than 5 law enforcement officers went to Apartment 1B at 625 Jefferson Place in the Bronx. (Tr. 25) Among the law enforcement officers was Detective Jose Chevre of the New York City Police Department. Apartment 1B was occupied at the time by Anthony Gall who had lived there for over 10 years. (Tr. 5) Gall, who is Gilmore's cousin, was the leaseholder of the Apartment. (Tr. 5, 7) Gall paid the rent for the apartment, and a third party named Donald also helped out with the rent. (Tr. 8) Gilmore used a bedroom in the apartment for six years and paid rent approximately twice. (Tr. 7, 9, 34) Gilmore did not use the bedroom as his primary residence, although he used it about every day. (Tr. 16, 38) Gall would go into Gilmore's bedroom from time to time to watch TV and to make use of the only air conditioner in the apartment, although the TV had been removed from the bedroom a few days prior to September 10, 2019. (Tr. 9, 24, 30) Gilmore knew that Gall went into Gilmore's bedroom in the apartment because Gall told Gilmore that he did. (Tr. 10) Gilmore gave Gall permission to go into the bedroom, (id.), and when Gall gave the police permission to go into the bedroom, he thought that he had the authority to do so. (Tr. 13) Gilmore was aware that Gall went into the bedroom when Gilmore was not there. (Tr. 34) Although there was a lock on the bedroom

2

door, it was broken, and Gilmore was aware that Gall would go into the bedroom even when it was locked. (Tr. 10-11) Both Gilmore and Gall used the same means to get into the bedroom if it was locked - namely a knife. (Tr. 33-34) The bedroom was not locked when Detective Chevre entered it. (Tr. 40)

On the day of the search, Detective Chevre was accompanied by about five uniformed law enforcement officers who had badges and weapons showing. (Tr. 25) Gall told Detective Chevre that it was Gall's apartment and that Gall's was name on the lease. (Tr. 12, 38) Detective Chevre asked Gall if Gall would consent to the search of Gilmore's room, and Gall agreed. (Tr. 12) Detective Chevre gave Gall a written consent to search form. Detective Chevre read the form to Gall and Gall signed it. (Tr. 41-42; Gov't. Ex. 1) Gall believed that he could refuse to consent to the search and could refuse to sign the consent form. (Tr. 12.) The written consent form recited, among other things, that Gall understood he had the right to refuse to sign the form and that the "consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsoever." (Gov't. Ex. 1) Based on the information provided by Gall, Detective Chevre wrote on the form the premises to be searched. (Tr. 42) The form recites as the premises to be searched: "625 Jefferson Place #1B Bedroom #2. whichs [sic] belongs to Jimmy Gilmore who is a cousin of (Anthony Gall). Anthony Gall is the

3

legal tenant of apartment #1B and gives consent to search Jimmy Gilmore's bedroom." (Gov't. Ex. 1) The form is signed by Anthony Gall, Detective Chevre, and a second police officer. (Tr. 42) It is clear that Gall knowingly and voluntarily consented, orally and in writing, to Detective Chevre's searching the room described as "Jimmie Gilmore's bedroom."[1]

Inside Gilmore's bedroom there was a cloth closet that contained various items. Detective Chevre took a photograph of the closet with the flaps open. (Gov't. Ex. 2) Detective Chevre testified that the photograph depicts the closet as it appeared at the time of the search and that prior to taking the photograph he did not touch anything in the room and did not open any closet coverings. (Tr. 43-44, 56) In plain view at the bottom of the closet was a pair of black shoes with a white stripe, which Detective Chevre seized and that the defendant now seeks to suppress. The shoes appeared to be the same shoes that Detective Chevre had seen an individual wearing in surveillance videos of the robberies that Detective Chevre was investigating. (Tr. 36-37, 44) In the cross examination of Gall, defense counsel introduced another photograph of the closet with the top

---

[1] In response to cross examination, Gall testified that he thought he was signing a search warrant and that if the officers had a search warrant, they could search the apartment. (Tr. 26) This testimony was not credible or persuasive because Gall admitted that he had no legal understanding of what a search warrant is and had no understanding of the difference between a search warrant and a consent to search. (Tr. 31-32) Gall testified that he gave permission to search, that he signed a consent to search form, that he believed he could refuse to sign the form, and that he believed he could refuse to allow the officers to search the bedroom. (Tr. 12-14, 32)

button fastened and the flaps on the closet partially closed. (Def. Ex. A). Gall took the photograph the day before the evidentiary hearing, almost a year after the search. (Tr. 29) Even that photograph shows the flaps of the closet open sufficiently to show the place from which Detective Chevre testified the shoes were seized. (Tr. 30)

## Conclusions of Law

The Fourth Amendment forbids "unreasonable" searches and seizures. A warrantless search is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).[2] One of those specifically established exceptions is a search conducted pursuant to consent, provided that the consent is voluntarily given. Id. at 222; see United States v. Matlock, 415 U.S. 164, 165-66 (1974). That consent can be given by a third party. Id. at 171; Schneckloth, 412 U.S. at 245-46. As refined by the Court of Appeals for the Second Circuit, a third party has authority to consent to a search of a home, "when that person (1) has access to the area searched and (2) has either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area." Moore v. Andreno, 505 F.3d 203, 208-09 (2d Cir. 2007); United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992).

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

In this case there is no question that Gall's consent to the search of the bedroom described as "Jimmie Gilmore's bedroom" was freely and voluntarily given. Gall testified that he knew that he could refuse to consent to the search of the bedroom and that he voluntarily consented to the search. He consented both orally and in writing after being advised of his ability to refuse consent. The presence of armed officers in the apartment is insufficient to negate Gall's testimony that he voluntarily consented to the search, and there is no evidence of any duress or coercion. See, e.g., United States v. Drayton, 536 U.S. 194, 205-06 (2002) ("The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."); United States v. Daffe, 604 F. App'x 85, 86 (2d Cir. 2015); United States v. Moreno, 701 F.3d 64, 77 (2d Cir. 2012); United States v. Snype, 441 F.3d 119, 131-32 (2d Cir. 2006); United States v. Murray, 352 F. Supp. 3d 327, 334 (S.D.N.Y. 2019).

It is equally clear that Gall had the actual authority to consent to the search of the bedroom in question. The first part of the Moore test requires that the consenting party have access to the premises searched. In this case, Gall had access. The bedroom was unlocked at the time of the search, and in any event, if it were locked, both Gall and Gilmore used the same

6

means of access, namely a knife that is the equivalent of a key for the broken lock.

The Government has also established that Gall met the second part of the Moore test. At the very least, the Government has proven that Gall had "permission to gain access to the area." Moore, 505 F.3d at 209. That is precisely what Gall testified that he had. Gilmore knew that Gall went into the bedroom when Gilmore was not there because Gall told him that he did. Gall justifiably thought that he had permission to give the officers consent to search the bedroom.

Relying on a footnote in Matlock, the defendant argues that Gall did not have authority to consent to the search of the bedroom because he did not use that bedroom for "most purposes." See Matlock, 415 U.S. at 171 n.7. Gall did not use the bedroom at issue as his own bedroom; he did not store his things in that bedroom and did not clean it. But the defendant reads too much into the footnote in Matlock. The footnote at issue described why common authority to consent to a search could not be implied "from the mere property interest a third party has in the property." Id. Hence, a landlord could not validly consent to a search of a house rented to another, or a hotel clerk consent to a search of a customer's room, because common authority to consent to a search "rests rather on mutual use of the property by persons generally having joint access or control for most

7

purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. While the use of the property "for most purposes" might be a relevant test for determining whether a third party has sufficient "common authority" over property for purposes of the second part of the Moore inquiry, there is no basis to limit the independent part of the Moore test which requires only that a third party consenter have "permission to gain access to the area." Moore, 505 F.3d at 209. Hence, if a third party has access to the area searched and permission to gain access to the area, that person would have authority to consent to the search. See, e.g., United States v. Marte-Cruz, 629 F. App'x 89, 91 (2d Cir. 2015); United States v. Lewis, 386 F.3d 475, 481 (2d Cir. 2004) ("[S]he had access and permission to enter, and could indeed enter at any time. Under the law of this Circuit, this evidence is sufficient to show that the mother had actual authority to consent to the search of her son's bedroom."). Under these circumstances, consistent with the footnote in Matlock, Gilmore assumed the risk that Gall, the third party, would voluntarily consent to the search of the bedroom.

In addition to actual authority to consent to the search, Gall had apparent authority to consent to the search. Gall told

8

Detective Chevre that Gall was the leaseholder of the apartment and that Gilmore did not use the apartment as a primary residence. See Moore, 505 F.3d at 209. A police officer's objectively reasonable belief that the officer has obtained consent, even if the officer has not, renders a search constitutional. See Illinois v. Rodriguez, 497 U.S. 177, 188-89 (1990); Moore, 505 F.3d at 209. A reasonable officer would have reasonably concluded that Gall had the authority to consent to a search of a room in his apartment. This is not a case where the officer's failure to ask questions would have yielded information that cast doubt on Gall's apparent authority to consent to the search of the bedroom. Indeed, further questions would have supported Gall's actual authority to consent to the search.

But while Gall had the actual and apparent authority to permit the officers to search the bedroom, that did not extend to closed containers in the bedroom that obviously belonged to Gilmore. See Snype, 441 F.3d at 136-37 (third party consent to search a room does not extend to containers in the room that "obviously and exclusively" belong to someone other than the consenting third party); United States v. Zapata-Tamallo, 833 F.2d 25, 27 (2d Cir. 1987); United States v. Turner, 23 F. Supp. 3d 290, 310 (S.D.N.Y. 2014).

However, the seizure of the shoes was justified by the plain view exception to the warrant requirement. Detective Chevre was able to see the shoes in plain view from where he stood inside the bedroom without moving anything. That was obvious from Government Exhibit 2 and Detective Chevre's testimony. While there is reason to question whether Defense Exhibit A accurately records how the closet was found almost a year before, even that photo shows the bottom of the closet where the shoes were found to be open and the flap unbuttoned except for the top button. There is no basis to question Detective Chevre's testimony that the shoes were observed in plain view without his moving anything. An officer who, from a lawful vantage point, sees evidence inside a container is permitted to seize it. See Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) ("If police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."); United States v. Miller, 430 F.3d 93, 102 (2d Cir. 2005) (undisputed that officers could seize shotgun observed in an open closet). Detective Chevre was lawfully in the bedroom that Gilmore used, and the officer could seize the distinctive shoes that were in plain view; the officer recognized the shoes as evidence from the surveillance videos he had reviewed.

Therefore, the seizure of the shoes did not violate the defendant's Fourth Amendment rights.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The defendant's motion to suppress the shoes found on September 10, 2019, is **denied.**[3]

SO ORDERED.

Dated: New York, New York
November 2, 2020

*John G. Koeltl*
United States District Judge

---

[3] The defendant had previously moved to suppress a cellphone, but the Government has represented that it does not intend to offer the cellphone at trial. ECF 27, at 12 n.5. Therefore, that part of the motion to suppress is moot.